**Affirmed and Memorandum Opinion filed September 11, 2012.**



**In The**

# Fourteenth Court of Appeals

### NO. 14-10-01210-CR

**RAYMOND MITCHELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Cause No. 1181757**

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the trial court convicted appellant, Raymond Mitchell, of burglary of a habitation and sentenced him to twenty-five years' confinement. In a single issue, appellant contends the trial court erred by failing to conduct, *sua sponte*, an inquiry regarding appellant's competency to stand trial. We affirm.

### I. BACKGROUND

During the morning of September 3, 2008, Natasha Mosely was exercising on a jogging track near the house of her relative, Rachel Lee. Mosely observed an unknown

man—later identified as appellant—inside Lee's house, walking back and forth between the glass front door and a window, peering outside. Mosely left and returned shortly in a car with a male friend. Mosely parked in front of Lee's house and called 9-1-1. Appellant repeatedly checked to see whether Mosely was still parked outside.

Officer Sellers arrived at the scene and observed appellant exiting the back of the house. Officer Sellers commanded appellant to stop, but appellant ran across the backyard and began climbing a fence. Officer Sellers pulled appellant off the fence and placed him on the ground. Officer Sellers pressed his knee against appellant's back and handcuffed him. Officer Sellers then searched appellant. Appellant possessed a foam baseball bat, shoe strings, a grocery-store card, and a debit card. Appellant stated his name was "Raymond Mitchell" and admitted he did not reside at Lee's house.

Officers observed that the front door to the house had been pried open and a window was broken. The interior of the house was in disarray. Appellant had also turned on the air conditioner and made a sleeping pallet on the floor in Lee's bedroom. Officers spoke with Lee, who stated she did not permit appellant to enter her house. Lee explained that she owned the items recovered from appellant and the debit card had been inside a nightstand in her bedroom. She also told officers she spent the prior night at her boyfriend's house and had left her house in an orderly condition.

Officer Huff transported appellant to jail. According to Officer Huff, appellant stated he had been asked to watch the house by its owner. Appellant said "Mr. Lee" was the owner of the house; apparently, appellant made this statement because he saw the name "Lee" on the debit card. However, appellant later told Officer Huff he entered the house because his foot hurt.

During October 2008, appellant was charged with burglary of a habitation. On August 5, 2009, the 180th District Court ordered appellant to undergo a medical exam because his "family claims [he] is HIV positive [and] has dementia." The physician who conducted the exam found that appellant was taking medication and physically able to attend court. On August 21, 2009, the parties filed "Motion for Psychiatric Examination:

2

Competency," alleging,

> [T]he defendant's sister reports symptoms of AIDS related dementia. The defendant is not able to relate a consistent statement of the events of the day of the alleged offense and presents facts to attorney which are not based on reality. Defendant is disoriented as to the evidence [of] persons and events—[i.e.,] defendant think he has a son and does not per his sister. The sister reports defendant's doctor told her that AIDS lesions were inside.

The 180th District Court granted appellant's motion and ordered that appellant receive psychiatric and medical examinations.

On August 17, 2009, Ginari Price, M.D., determined appellant did not need psychiatric medication. However, a month later, Stephen McCary, Ph.D. determined appellant was incompetent at that time to stand trial. In his September 21, 2009 report, Dr. McCary noted appellant (1) is known as Raymond Mitchell and Raymond White, (2) claimed to be diagnosed with HIV and suffer from vision and hearing impairments and foot problems, (3) used a cane, (4) rambled and had difficulty remaining focused, and (5) stated he has an adult daughter. Dr. McCary concluded appellant was probably unable to discuss pertinent facts and make strategic decisions with counsel or testify on his own behalf. Dr. McCary recommended appellant receive additional evaluations and opined that appellant likely will not regain competency if he suffers from AIDS-related dementia but probably will regain competency if he is predominantly affected by psychiatric issues.

On September 25, 2009, the 180th District Court found appellant incompetent to stand trial and ordered him committed for 120 days to a state mental health facility. The case was transferred to the 351st District Court, which was responsible for the competency-restoration docket. On February 19, 2010, the State filed a "Motion for Psychiatric Examination: Competency" with the 351st District Court. Attached to the motion was a letter from an employee with the Mental Health-Mental Retardation Authority of Harris County, who reported appellant displayed "no mental impairment that would suggest that he is not able to assist in his own defense" and appeared to

3

"understand court procedure and the nature of the charges pending against him." The 351st District Court ordered appellant to receive another psychiatric evaluation.

On February 25, 2010, Dr. McCary re-evaluated appellant and found "he did not appear to be psychotic or out of touch with reality" and was competent to stand trial. Dr. McCary explained appellant (1) stated his actual name was Raymond "Bubba" Mitchell, Jr., (2) rambled and had difficulty remaining focused, (3) had a history of foot problems and head traumas and suffered from AIDS per his medical records, and (4) has not had inpatient or outpatient psychiatric treatment. Dr. McCary also noted, "[Appellant's] jail medical records indicate that during the past month he has exhibited symptoms or behaviors including: 'well groomed with bright affect; was tangential at times, but easily redirectable; he has visual impairment, hearing impairment and is HIV+; has reasonable knowledge about his legal situation and appears to have capacity at this time.'" When Dr. McCary asked appellant about his legal circumstances, appellant provided the following account:

> [Appellant] described how a truck had run over his foot. He said that he tried to get the driver to drive him to a nearby hospital, but the driver took him to within a block of the hospital and then pulled him out of the truck. He discussed how he "limped" along and followed the driver to a house. He stated that he went into the house and he was looking for the driver. He reported that the police soon arrived and they arrested him. He said that he thought that he could have been charged for trespassing, but he denied that he was trying to commit a burglary.

Dr. McCary opined, "While it was difficult to keep [appellant] focused as he gave his rambling description of what happened, he did appear to have sufficient ability to disclose pertinent facts, events, and states of mind to Counsel." Dr. McCary did not reference dementia in his report but expressed that appellant should remain competent to stand trial, particularly with ongoing treatment and medication.

On October 19, 2010, the 351st District Court determined appellant was mentally competent to stand trial. On December 7, 2010, the trial court conducted a bench trial. Appellant did not testify during the guilt-innocence phase. After the trial court found

appellant guilty of the charged offense, appellant pleaded true to two enhancement offenses. Appellant then testified on his own behalf, explaining that he was sixty-three years old and suffers from severe hearing and vision impairment and HIV; according to appellant, the last time he was incarcerated, he received a compassion release due to his illness. Appellant then provided the following, narrative testimony regarding the underlying incident:

> **[Defense Counsel:]** So your vision is almost gone?
>
> **[Appellant:]** My vision almost gone. I had surgery on this eye (indicating). It cleared up. I went back to have the right eye surgery and they scratched it.
>
> During the period of time I was supposed to go back, this accident occurred. They said I burglarized something. I was standing on the corner, me and another gentleman, talking. The truck passed by, pinned me down. I said, "Take me to LBJ."
>
> He said, "Mister, I don't have no insurance." I say, "Own up to it, sir, and I will say it was accident." He put me in his truck, we get a half a block, he snatched me out the truck. Same time I had a phone in my pocket, a cellular phone. I called my nephew and my stepson at the park because they thought the person would rob me.
>
> We get there, right there on that street. It's Hoffman and that other street that went into that street. I pull him out the truck. I said, "Man, why you lie?" Hit him. He broke and run. I say, "You-all, go ahead. I got him." I left out. That house where they said I burglarized, I can see through it. I say he must have went up in there. I walked up there. I seen two cards. I picked up the cards. It say Lee. There's another card, a discount food card. I say he got to be in there. Must be his name Lee.
>
> A truck pull up, a lady and a gentleman in the truck. I say, "Man, you-all live here?" They say, "Hold up." I say, "No, I'm looking for this fellow."
>
> I limp around the back. I say he might have jumped the fence. When I turn around, the law came up, threw the pistol on me. He say, "Get down." I say, "Get down for what?" He snatch me down and kick me. I say, "Man, what the hell you kicking me for?" Excuse my -- "Man, what the hell you kicking me for?" He said -- going through my pocket. I had 3500 and one penny. Took the 3500 and stick it in his pocket --
>
> . . .

They say a -- it was -- they say a burglary. I say, "I'm -- not a burglary." One law standing there was on the scene. He say, "I know you." Big, Spanish guy. He say, "Your name Bubba." I say, "Yes, sir." I say, "Look at my feet." He say, "God damn." They swole up.

I say nobody -- he say just go on with them. Black officer put me in the car, took me to the city. I'm sitting in the city. They shook me down. They say what -- put me, then it flood. I couldn't walk up the steps. They pick me up, put me in medical facility. They gave me some pills. I fell out.

When I woke up, they said, "You all right?" I said, "I'm in pain." Woke up, was in the county. I say, "Man," I say, "I'm not no burglar, Man." I ask my niece -- I made one call. I made no call since. They ask me did I say that. They say that lady -- I guess whoever was in that truck, they say he was storing dope in that woman's house and they messed over the dope. So they using you as the suspect to say you took the dope. But the man say who got the dope say he know you ain't no user.

I say don't mess with it. I just got to ride this out. And I've been riding it out ever since. Because first I was in 180. He got my medical records. They put me on the docket and they took me off the docket. I say, "What's going on?" They say, "You're going to 351." I say, "My band say 180, band say that right now, 180." I say, "No, I'm not going." They say, "Hold up, Bubba, we know you. Go on up there."

I've been coming up here ever since the last time -- the first time I ever seen Your Honor was that time I stumbled with that door because of my vision. Then I was at -- in the county jail. He took me to LBJ. They take me on this name on my band, Raymond White. I stay shackled up. I say, "I'm in for my eyes" -- because when I got arrested, I had an envelope in my pocket, too, for my appointment on the 6th. I say, "I'm in for my name." They say, "Your name Raymond White." I say, "My name is Raymond Mitchell." Left me standing up on the wall. They take me back to this county.

I say, "Man" -- I went down. I say, "Would you-all please put me on my right name so I can go get my physical on my eyes and everything?" They say, "We'll see if we can do it." Call me back down there (inaudible) --

. . .

They gave me some eye drops. The eye drops say do not put them in your eyes when it's foggy. I took a magnifying glass -- I say I'm putting these drops in my eyes. I go to the physician. He give me these glasses. He say, "Man, I don't know what to do." He give me not this pair, I got two pair. I say, "Man, my vision is gone." Every time I stumble I run into something.

6

I say, "Man, I can't hear out of" --

**[Defense Counsel:]** Mr. Mitchell, did the doctors also make a diagnosis that you might have some mental health issues?

**[Appellant:]** He said -- when he come, took my thing, he say, "You got glaucoma." I said I had surgery - -

**[Defense Counsel:]** Let me try to see if we can talk about your mental health. Okay? Have you been diagnosed as having bipolar disease?

**[Appellant:]** What are you saying?

**[Defense Counsel:]** Bipolar disease.

**[Appellant:]** Bipolar?

**[Defense Counsel:]** Bipolar.

**[Appellant:]** What's that?

**[Defense Counsel:]** Do you remember the doctor telling you he was diagnosing you with bipolar disorder?

**[Appellant:]** I don't know what - -

**[Defense Counsel:]** Have you been taking any medicines while you've been in county jail to help keep your mind straight?

**[Appellant:]** I don't know. They be saying I can hear out of one side. I know from being in TDC getting hit with them clubs, billy clubs, is kind of -- (inaudible) kind of out here in this county I was well known. (Inaudible). I work classification. I ain't never ask for a favor. They always say -- type up the change list, pull a coat. I ask him, I say, "Would you subpoena Major, the captains, can all speak for me." Every time I come (inaudible) they say, "Where are you going?" I say I'm going to -- (inaudible) what they got it for. (Inaudible). It ain't me, man -- I say every time I come here to this county jail, if you've got me right, I accept my time. I go to TDC. I say, "This, it's not me." I just got to go away. If I get a life, I got to get a life because it ain't me. I ain't no burglar. My feet still haven't healed, sir. It was swole up. They x-rayed it four, five times (inaudible). They can't -- that's why I walk with a cane.

**[Defense Counsel:]** Mr. Mitchell, is there anything else in particular you wanted the Judge to know?

**[Appellant:]** That's all I have to say on my behalf, Your Honor. I appreciate you taking time out to listen to me and I thank you for seeing me that time when I stumbled in your court the last time.

**[Trial Court:]** All right. Thank you, Mr. Mitchell. [Prosecutor], do you have any questions?

7

**[Prosecutor:]** Nothing from the State, Your Honor.

**[Trial Court:]** Anything else from the defense[?]

**[Defense Counsel:]** No, Your Honor. Defense rests. Judge, we -- if I might, Your Honor, we would ask the Judge to take judicial notice of the reports that have been filed amongst the Court's paper concerning Mr. Mitchell's competency and his mental health.

**[Trial Court:]** I will do that.

The trial court then sentenced appellant to twenty-five years' confinement.

## II. *SUA SPONTE* INFORMAL INQUIRY REGARDING COMPETENCY

In his sole issue, appellant contends the trial court erred by failing to conduct an inquiry into appellant's competency during trial.

### A. Relevant Law and Standard of Review

We review a trial court's failure to conduct a competency inquiry *sua sponte* for abuse of discretion. *Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009); *Hobbs v. State*, 359 S.W.3d 919, 923–24 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Under this standard, we do not substitute our judgment for that of the trial court but determine whether the trial court's decision was arbitrary or unreasonable. *Montoya*, 291 S.W.3d at 426; *Hobbs*, 359 S.W.3d at 924.

The trial court's duty to conduct an informal inquiry into the defendant's competency is triggered when some evidence raises a "bona fide doubt" that the defendant lacks a rational and factual understanding of the proceedings against him or the ability to consult his attorney with a reasonable degree of rational understanding. *See* Tex. Code Crim. Proc. Ann. art. 46B.003(a) (West 2006); *id.* art. 46B.004(c) (West Supp. 2012)[1]; *Montoya*, 291 S.W.3d at 425. A bona fide doubt may exist if the defendant

---

[1] Article 46B.004 was amended, effective September 1, 2011, to add subsection c-1, which provides in relevant part that "the court is not required to have a bona fide doubt about the competency of the defendant." *See* Act of May 24, 2011, 82nd Leg. R.S., ch. 822, §§ 21(a), 22, 2011 Tex. Sess. Law Serv. 1893, 1899–1900 (codified at Tex. Code Crim. Proc. Ann. art. 46B.004(c-l) (West Supp. 2012). We do not determine the effect of subsection c-1 to the instant case because the subsection was not in effect at the time of appellant's trial and neither party has suggested its application.

8

exhibits truly bizarre behavior, has a recent history of severe mental illness, or has at least moderate mental retardation. *See Montoya*, 291 S.W.3d at 425. Evidence sufficient to create a bona fide doubt about the defendant's competency may come from the trial court's own observations, known facts, evidence presented, motions, affidavits, or any other reasonable or credible sources. *Hobbs*, 359 S.W.3d at 924. The evidence need not be sufficient to find an accused actually incompetent; rather, it must create "a real doubt in the judge's mind as to the defendant's competency." *See Fuller v. State*, 253 S.W.3d 220, 228 (Tex. Crim. App. 2008). If evidence warrants a competency hearing, and the trial court denies such a hearing, the defendant is deprived of his constitutional right to a fair trial. *See Pate v. Robinson*, 383 U.S. 375, 385 (1966).

## B. Analysis

Appellant contends the trial court should have inquired into his competency because of his bizarre testimony during the punishment phase, particularly in light of his prior incompetency. Appellant argues his testimony was "truly bizarre" because (1) appellant stated he was "pinned" by a truck and sustained a foot injury (despite officers' testimony that appellant did not appear to be injured), (2) appellant explained he called his "stepson" even though he does not have a son, (3) appellant's testimony was largely off-topic and irrelevant, and (4) when asked about his mental health, appellant provided non-responsive answers.

We agree that, from the cold record, appellant's account of the underlying incident seems tangential and improbable. However, the trial court was in a superior position to assess appellant's competency, credibility, and demeanor during his testimony. *See LaHood v. State*, 171 S.W.3d 613, 619 n.2 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). Despite his rambling and inarticulate narrative, the crux of appellant's testimony was his explanation for entering Lee's house. Significantly, Officer Huff testified appellant initially stated he had permission to be in Lee's house but then changed his story and claimed he entered the house because his foot hurt. In his second report, Dr. McCary noted appellant stated that a man had "run over" appellant's foot and he

9

followed the man into Lee's house. During both of Dr. McCary's evaluations, appellant stated he could have been charged with trespassing but insisted he did not commit burglary. During the punishment phase of trial, appellant offered a substantially similar story—that a man "pinned" appellant with a truck, injuring his foot, and appellant followed the man to Lee's house. Again, appellant insisted he did not commit burglary.

Appellant argues his following testimony regarding events after he was brought to jail is particularly disjointed and strange:

> I say nobody -- he say just go on with them. Black officer put me in the car, took me to the city. I'm sitting in the city. They shook me down. They say what -- put me, then it flood. I couldn't walk up the steps. They pick me up, put me in medical facility. They gave me some pills. I fell out.
>
> When I woke up, they said, "You all right?" I said, "I'm in pain." Woke up, was in the county. I say, "Man," I say, "I'm not no burglar, Man." I ask my niece -- I made one call. I made no call since. They ask me did I say that. They say that lady -- I guess whoever was in that truck, they say he was storing dope in that woman's house and they messed over the dope. So they using you as the suspect to say you took the dope. But the man say who got the dope say he know you ain't no user.

In the first paragraph, it appears appellant described going to the jail infirmary and receiving medicine. His reference to a "flood" is odd but could simply mean it was raining outside. The second paragraph appears to be a continuation of appellant's explanation regarding why he was wrongly charged with burglary.

Appellant also notes that, toward the end of his testimony, counsel questioned appellant regarding bipolar disorder and whether he had been taking medication. Appellant responded that he does not know what bipolar disorder is or whether he had been taking medication. Appellant then provided unrelated testimony regarding (1) having been beaten by jail guards, (2) his friends in the police department who should have been subpoenaed, and (3) his propensity to confess when he truly is guilty. However, appellant's failure to directly answer counsel's questions may have been due to his hearing impairment or concentration difficulties. If so, his failure to answer the questions would not be probative of his incompetency.

10

The progression of appellant's account regarding the incident supports an inference that appellant recognized burglary was more serious than trespassing and offered an alibi for being in Lee's house. There is also nothing unusual about a man with a long criminal history claiming officers kicked and robbed him during his arrest or beat him while he was in jail. We are unable to discern from the record appellant's demeanor and credibility while testifying and must give great deference to the court's implicit decision not to inquire into appellant's competency. *See McDaniel v. State*, 98 S.W.3d 704, 713 (Tex. Crim. App. 2003).[2] It may have been apparent to the trial court that appellant's testimony was fabricated, not delusional. Accordingly, the trial court did not err by failing to conduct a competency inquiry based on appellant's outlandish and tedious testimony.

Next, we consider whether appellant's reference to a "stepson" should have raised concerns regarding his competency. As discussed above, in a motion for psychiatric evaluation, defense counsel asserted that appellant claims he has a son "but does not per his sister." During his first evaluation with Dr. McCary, appellant stated he has an adult daughter but did not mention having a son. However, during trial, appellant testified that he called his "stepson" at the time of the incident. Perhaps appellant intentionally used the term "stepson" instead of "son" because he realized it had been revealed that he does not have a son. Appellant may also have been referring to a family member or friend

---

[2] We also note the dissimilarities between appellant's testimony and the defendant's testimony in *Greene v. State*, which the San Antonio Court of Appeals determined was so bizarre it necessitated an informal competency inquiry. 225 S.W.3d 324, 329 (Tex. App.—San Antonio 2007, no pet.). In *Greene*, the defendant testified he (1) thinks he is insane, (2) was recently institutionalized because he was hearing voices and having a vision of an evil twin, (3) thinks the complainant may have been his "baby's mama" but is not sure "because [the defendant had] seen people change shape in front of [him]," (4) the complainant's eyes turned evil, and the defendant started seeing warping shadows, (5) police shot him with a "marker gun" which caused a part of his spine to chip, and (6) he once bit a police officer because another officer believed the defendant was a vampire and telepathically instructed him to do so. *Id.* at 326–28. Inarguably, the *Greene* defendant's testimony is exponentially more bizarre than appellant's testimony. Further, it is worth noting that the Court of Criminal Appeals later abrogated the standard of review employed by the San Antonio court and employed the standard we apply in the instant case. *See Montoya*, 291 S.W.3d at 424–25.

whom he considers or simply calls his stepson. Regardless, in light of all the circumstances, the trial court was not required to inquire into appellant's competency based on his reference to a stepson.

There is also substantial evidence in the record suggesting appellant understood the nature of the proceedings against him and was able to communicate with his attorney. A defendant's competency to stand trial refers to his *present* ability to comprehend and aid in his defense. *See Montoya*, 291 S.W.3d at 425; *McCoin v. State*, 56 S.W.3d 609, 613–14 (Tex. App.—Texarkana 2001, no pet.). Thus, the fact that appellant had previously been found incompetent and suffered from a host of physical and mental issues did not suggest he was incompetent at the time of his trial, particularly because Dr. McCary determined appellant was competent during his last evaluation. *See McDaniel*, 98 S.W.3d at 712 ("Appellant's history of mental illness was insufficient to create a bona fide doubt about his present mental condition, in light of the more recent psychological evaluation attesting to his mental competency.").

During the guilt-innocence phase of trial, defense counsel cross-examined witnesses regarding whether appellant had been injured on the day of the incident and whether officers kicked or struck appellant while he was on the ground, recovered $3500 from appellant, or found more of Lee's property on the ground outside her house. The fact that counsel asked these questions demonstrated appellant was able to effectively communicate his account of the incident to counsel. Furthermore, after the State rested its case during the guilt-innocence phase, defense counsel requested and was granted a moment to confer with appellant. Thereafter, counsel stated, "Judge, I've discussed with [appellant] his options to testify or not to testify and at this time he advises me that he does not wish to testify in the matter." Similarly, after the State rested its case during the punishment phase, defense counsel again asked for a "moment." Apparently, counsel and appellant used this "moment" to discuss whether appellant would testify because counsel then called appellant to the stand. These exchanges further evince that appellant was able to consult with his attorney with a reasonable degree of rational understanding.

Finally, appellant's ability to answer the trial court's questions demonstrated that he understood the nature of proceedings against him. At the beginning of trial, when the trial court asked appellant for his plea to the indictment, appellant readily responded "Not guilty, sir." Furthermore, appellant pleaded "true" when the trial court inquired regarding certain enhancement offenses. Although the record indicates appellant had difficulty understanding some of the trial court's questions, such difficulty may have been attributable to appellant's hearing and vision impairments, and appellant eventually provided coherent answers. *See Montoya*, 291 S.W.3d at 426 ("[T]he court of appeals took instances of the defendant's confusion or misunderstanding of the judge's questions in isolation and out of context as evidence of incompetence when the rest of the record shows that the issues were immediately and easily clarified by the trial judge or defendant's attorney and that the defendant indicated her understanding.").[3]

Accordingly, in light of all the evidence and circumstances, we do not conclude the trial court must have had a "bona fide doubt" regarding appellant's competency to stand trial. We hold that the trial court's decision not to conduct an informal competency inquiry was neither arbitrary nor unreasonable. Appellant's sole issue is overruled.

We affirm the trial court's judgment.

/s/          Charles W. Seymore
             Justice

Panel consists of Chief Justice Hedges and Justices Seymore and Brown.

Do Not Publish — Tex. R. App. P. 47.2(b).

---

[3] We recognize appellant twice interrupted the proceedings by blurting out facts relevant to his defense and account of the incident. Because appellant's outbursts, albeit inappropriate, were strategic, the trial court did not err by failing to interpret the outbursts as evidence of appellant's possible incompetency. *See LaHood*, 171 S.W.3d at 619 ("The fact that appellant made outbursts during trial is not evidence of an inability to communicate with counsel or to appreciate the proceedings against him. Although inappropriate, the outbursts were immediate and logical responses to statements made or questions asked during trial." (citation omitted)).

13